# EXHIBIT B

Electronically Filed - JACKSON - INDEPENDENCE - August 09, 2024 - 04:51 PM

# IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
## AT INDEPDNENCE

| | | |
|---|---|---|
| MICHELLE PAYLOR, | ) | |
| on behalf of herself and | ) | |
| all others similarly situated, | ) | |
| 660 N Spring St | ) | Demand for Jury Trial |
| Independence, MO 64050 | ) | |
| | ) | |
| And | ) | |
| | ) | |
| RANDALL CARVER | ) | |
| On behalf of himself and | ) | |
| All other similarly situated, | ) | |
| 17009 E US Highway 24 | ) | |
| Independence, MO 64056 | ) | Case No. |
| | ) | |
| *Plaintiffs*, | ) | PETITION – CLASS ACTION |
| | ) | |
| v. | ) | |
| | ) | |
| FTW ENTREPRISES LLC d/b/a | ) | |
| FTW HOLDINGS LLC | ) | |
| Serve registered agent: | ) | |
| Parker Webb | ) | |
| 1 E Armour Blvd, Suite 150 | ) | |
| Kansas City, MO 64111 | ) | |
| | ) | |
| And | ) | |
| | ) | |
| FTW INVESTMENTS LLC | ) | |
| Serve registered agent: | ) | |
| Parker Webb | ) | |
| 1 E Armour Blvd, Suite 150 | ) | |
| Kansas City, MO 64111 | ) | |
| | ) | |
| And | ) | |
| | ) | |
| Parker Webb | ) | |
| 1 E. Armour Blvd. Suite 150 | ) | |
| Kanas City, MO 64114 | ) | |
| | ) | |
| And | ) | |
| | ) | |
| Logan Freeman | ) | |

11324 Jarboe St )
Kansas City, MO 64114 )
)
And )
)
Cory Tuck )
7921 Rosewood Dr. )
Prairie Village, KS 66208 )
)
And )
)
728 N JENNINGS RD )
PARTNERS, LLC )
Serve registered agent: )
Klawuhn, Philip A. )
10150 N. Ambassador Dr. Suite 100 )
Kansas City, MO 64153 )
)
)
And )
)
TANGO PROPERTY )
MANAGEMENT, LLC )
Serve registered agent: )
Klawuhn, Philip A. )
10150 N. Ambassador Dr. Suite 100 )
Kansas City, MO 64153 )
)
And )
)
STONEYBROOK PARTNERS, LLC )
Serve registered agent: )
Registered Agents Inc. )
117 S Lexington ST STE 100 )
Harrisonville, MO 64701 )
)
And )
)
STONEYBROOK TOWERS, LLC )
Serve registered agent: )
Registered Agents Inc. )
117 S Lexington ST STE 100 )
Harrisonville, MO 64701 )
*Defendants.* )
)
)

2

## CLASS ACTION PETITION & DEMAND FOR JURY TRIAL

Comes now Plaintiffs Michelle Paylor and Randall Carver, individually and on behalf of all other persons similarly situated, for their petition for damages against Defendants FTW Enterprises, LLC, d/b/a FTW Holdings, LLC, FTW Investments, LLC, Parker Webb, Logan Freeman, Cory Tuck, 728 N Jennings Rd Partners, LLC, Tango Property Management, LLC, StoneyBrook Partners, LLC, and StoneyBrook Towers, LLC states the following:

## NATURE OF ACTION

1. This is a class action claim arising from Defendants' unlawful and negligent practices in violation of both the Missouri Merchandising Practices Act and the Implied Warranty of Habitability.

2. Defendants are a group of entities and individuals who have agreed to work together and in joint concert with another for the purpose of making a financial profit off of real estate investments, including the two properties at issue in this case: Independence Towers and Stoney Brook East Apartments.

3. To accomplish their objective of profiting off of these apartment buildings, Defendants illegally and negligently ignored the rights of their tenants, used unlawful deceptive practices in connection with leasing these properties, and refused to provide safe and habitable living conditions.

4. Defendants' decision to maximize their investor's profits rather than fulfill their obligations to their tenants, and in direct detriment to them, has led to the widespread presence of cockroaches, bed bugs, filth, vermin, rodents, water intrusion, flooding, mold, inadequate and/or no air conditioning and heat, inadequate and/or no running water, lack of security, unsecured doors

and windows, unsafe and damaged parking garage, ineffective maintenance, inadequate repairs, and dangerous conditions in the common areas.

5.     Despite all this, Defendants demand full rent from their tenants while repeatedly and intentionally and/or negligently failing to address unlawful housing conditions that pose a serious threat to health and safety of their tenants.

6.   Defendants ongoing business practice is to profit at the expense of vulnerable tenants by collecting full rent while refusing to use the rental income to keep their units safe and habitable, but rather convert such rental income into their own profit.

**PARTIES**

7.     Plaintiff Michelle Paylor is a resident and citizen of the state of Missouri.

8.     Ms. Paylor is a former resident of Independence Towers and brings this action on her own behalf and as a representative of a class of persons who also resided in Independence Towers during the relevant time period.

9.     Ms. Paylor is a "person" and leased real property for her personal use from Defendants in a "sale" within the last five years, as those terms are defined in §407.010 *et seq.*, R.S.Mo.

10.     She timely paid her rent.

11.     Plaintiff Randall Carver is a resident and citizen of the state of Missouri.

12.     Mr. Carver is a former resident of StoneyBrook East Apartments and brings this action on his own behalf and as a representative of a class of persons who also resided in StoneyBrook East Apartments during the relevant time period.

13.     Mr. Carver is a "person" and leased real property for his personal use from

Defendants in a "sale" within the last five years, as those terms are defined in §407.010 et seq., R.S.Mo.

14.    He timely paid his rent.

15.    Defendant FTW Enterprises, LLC, d/b/a FTW Holdings, LLC is a limited liability company registered to do business in Missouri.

16.    Defendant FTW Investments, LLC is a limited liability company registered to do business in Missouri.

17.    Defendant Parker Webb is an individual and a resident of Missouri.

18.    Defendant Logan Freeman is an individual and a resident of Missouri.

19.    Defendant Cory Tuck is an individual and a resident of Missouri.

20.    Defendant 728 N Jennings Rd Partners, LLC is a limited liability company registered to do business in Missouri.

21.    Defendant Tango Property Management LLC is a Missouri limited liability company doing business in Missouri.

22.    Defendant StoneyBrook Partners LLC is a limited liability company registered to do business in Missouri.

23.    Defendant StoneyBrook Towers LLC is a limited liability company registered to do business in Missouri.

## JURISDICTION AND VENUE

24.    This Court has jurisdiction over this action pursuant to §506.500 R.S.Mo. in that Defendants all transact business within the state of Missouri, all agreed to profit off of lower-income individuals in the state of Missouri, and all committed one or more tortious acts within the state of Missouri.

25.     Venue is proper in this Court pursuant to § 508.010 R.S.Mo., because Plaintiffs' causes of action accrued in Eastern Jackson County, Missouri, which is the location of both Independence Towers and StoneyBrook East Apartments.

## FACTUAL ALLEGATIONS

### Defendants engaged in a civil conspiracy.

26.     Although civil conspiracy has its own elements that must be proven, it is not a separate and distinct action.

27.     Rather, it acts to hold the conspirators jointly and severally liable for the underlying illegal or unlawful act.

28.     As pled throughout, and as Plaintiffs will prove at trial, the Defendants engaged in a civil conspiracy – they, and each of them, agreed on a common scheme and committed illegal and unlawful acts in furtherance of that scheme.

29.     In short, Defendants agreed to work together to profit off lower-income citizens of Independence, Missouri by buying the buildings they live in and collecting their rent without spending the resources to keep the buildings habitable and safe.

### Defendants found a company during the height of COVID to own, control, and profit off multifamily housing throughout the Kansas City area, including Independence, Mo.

30.     In or around March of 2020, Defendants Webb, Freeman, and Tuck (together, the "Individual Defendants") were investing in commercial properties, mainly retail at the time, in and around the Kansas City area.

31.     At the time, between the three of them, they were under contract for a total of five commercial investment properties, most of them retail, as opposed to residential properties.

32.     Due to COVID, those deals fell apart.

33.     So, the three of them took a step back, thought about what they wanted to do together strategically, and formed FTW Investments, LLC ("Defendant FTW") on or about April 11, 2020.

34.     Upon information and belief, that same month they founded FTW Holdings, LLC ("Defendant FTW Holdings," and, together with Defendant FTW, the "FTW Defendants"), to hold cash and real property in furtherance of their agreement.

35.     As the three co-founders of the FTW Defendants, they would meet every Monday to discuss and agree upon their goals and objectives as a group and as a company, and then spend the rest of the week working to achieve those goals and objectives.

36.     One of the goals and objectives they agreed upon was to make money by investing in affordable multifamily housing in Independence, Missouri.

37.     COVID presented a buying opportunity in their eyes, and one of the properties they set their eyes on was Independence Towers.

38.     In or around Summer of 2020, they began negotiations for the acquisition of that property.

39.     Independence Towers was one of many affordable multifamily properties they acquired as part of their COVID investment scheme. In fact, they would later brag that by the time they acquired Independence Towers they already owned half the "comps" in the area.

40.     When touring Independence Towers they looked out the window and saw StoneyBrook East Apartments, and decided they would attempt to acquire that property too.

**Defendants created The StoneyBrook Towers Investment to profit by increasing rents at both the Independence Towers and StoneyBrook East Apartments by up to 43%.**

41.     Independence Towers is located at 728 N Jennings Rd, Independence, MO 60456, and is parcel number 16-430-03-48-00-0-00-000 in Jackson County.

Electronically Filed - JACKSON - INDEPENDENCE - August 09, 2024 - 04:51 PM

42.     StoneyBrook East Apartments is located at 17007-17013 US Highway 24, Independence, MO, 64056, and is parcel number 16-430-03-03-00-0-00-000 in Jackson County.

43.     Defendants agreed that their acquisition of these two properties would be a single investment scheme (the "StoneyBrook Towers Investment").

44.     They put the money they raised from their investors – approximately $2.86 Million – into a single holding company, Defendant StoneyBrook Towers LLC, which they claim would own both of the "underlying assets," as they call the Independence Towers and Stoneybrook Towers buildings.

45.     Upon information and belief, StoneyBrook Towers, LLC owns these "underlying assets" via its sole ownership of Defendant 728 N Jennings Rd Partners LLC, which purchased the apartment building known as Independence Towers on or about February 26, 2021, and Defendant StoneyBrook Partners LLC, which purchased StoneyBrook East Apartments on or about December 29, 2020.

46.     They pitched their investors by telling them the Independence Towers property would provide strong cash flow, whereas the StoneyBrook East Apartments would provide less cash flow, but a better opportunity to increase the equity of the building after purchase.

47.     They also told their investors that they would combine the amenities of the two properties. For example, residents of Independence Towers could use StoneyBrook East's pool and residents of StoneyBrook East could use the laundry rooms in Independence Towers.

48.     However they pitched it to their investors, the agreement among themselves was clear—max out their income by raising rents while spending as little as possible on the properties.

49.     At the time they acquired the properties, the average rent at StoneyBrooke East was $414 a month, and the average rent at Independence Towers was $580 a month.

50.     This was too low, in Defendants' eyes, and they "knew where the market was because we own half the comp set. So we knew what we were getting on our other properties … we knew we had the ability to go in and push that … so were going to make that spend, basically clean up units, and then push those rents to market where other properties are … so we saw immediately the ability to go push up rents anywhere from, frankly, $80 to $180 a month."

51.     In the middle of COVID, Defendants saw an investment opportunity. By their own words, they scooped up half the multifamily affordable housing in Independence because they knew they could immediately increase rent between 13% - 43%.

52.     This was done without regard to whether the residences provided therein were "worth" such increase, but only because the residents had few, if any, alternatives so long they – Defendants – controlled the market.

53.     Defendants "absolutely" agreed that the plan "is either to try to raise the rents while the resident is in there or they can maybe move to a renovated unit or they could decide to leave because they don't want to pay that extra delta and then you have a vacant unit that you can renovate and then rent out to someone else that's willing to pay that extra premium."

54.     "Delta" is a term often used in finance and option investing, wherein there is no at-issue real property used by families as their home, and Defendants' use of such a term in this manner reveals their purpose was to harvest profits from the rents of residents, without regard to the safety and habitability of the homes they controlled.

**Defendants failed to allocate funds to keep the buildings habitable, including by ignoring and hiding from their investors warnings that Independence Towers needed serious repairs.**

55.     Defendants had never acquired a building as large as Independence Towers and admitted that because of this they struggled with doing their due diligence.

56.     They recognized there were several things they needed to be concerned with, such as the boiler system and the parking garage, but they still refused to allocate money to fix these things.

57.     Shortly after the deal closed, Defendant Webb admitted that they "hadn't thought about some of those things like the water and whatever else," but that, in his view, "it ended up being ok."

58.     He added: "Things like that that we hadn't necessarily you know been aware of that we found out through this process and now have the benefit of that knowledge moving forward."

59.     What they did not do, however, was allow their investors the benefit of that knowledge.

60.     For instance, upon information and belief, a November 19, 2020, inspection by UES Consulting Services detailed the conditions at Independence Towers and how much it would cost to repair them.

61.     The report showed, upon information and belief, that the plumbing, boiler, and roof all needed to be replaced at a cost of over $2,000,000.00.

62.     Defendants agreed not to share this report with their investors.

63.     Instead of being honest with their investors about the content of the report, they told them that they talked through the report, brought in their own construction crew, and determined the expenses were of no concern.

64.     They told their investors that the seller agreed to cover all repairs in the report. The message they agreed upon, as Defendant Webb put it, was: "it doesn't need a whole lot after these maintenance items which were already capitalized by the seller."

65. Defendants allocated very little money for maintenance and repairs, including bare-minimum renovations, but did not make the full replacements or repairs the UES report identified.

66. As it relates to Independence Towers, the renovations had a budget of $4,000 per unit. Defendants admitted it was "basically clean up the units."

67. StoneyBrook East had a budget of only $7,000 per unit for its renovations.

68. These were not serious renovations; they were not even enough to maintain the units in a habitable condition.

69. Defendants were in over their heads, but they nonetheless had a meeting of the minds to use other people's money to acquire properties that are home to hundreds of people while not spending the resources to keep those homes in a habitable and safe condition, on the hopes that somehow enough money would be left over to pay their investors back while making a good profit themselves.

70. Likely, they realized at some point they had failed to raise enough money from investors to keep the property in a habitable and safe condition but decided to go through with their plan anyway.

71. This would eventually require Defendants to create Defendant Tango Property Management, LLC on October 21, 2021. This is because, upon information and belief, the third-party property management companies Defendants were using pushed back and/or outright refused to go along with Defendants' plan to refuse to spend enough money to keep the properties in safe and habitable condition.

72. Defendants own, operate, and control Tango Property Management, which has agreed and joined with Defendants' unlawful scheme to spend as little money as possible in maintaining these properties, to the detriment of those who call it home.

**Defendants Webb, Tuck, and Freeman are individually liable because they knew of and took part in the wrongs.**

73.     The Individual Defendants together founded Defendant FTW Investments, LLC and are currently its chief officers.

74.     At FTW Investments, LLC, Defendant Freeman oversees the company's capital outreach, capital stack, investment strategies, and on-going investor relations.

75.     Because Defendant Freeman oversees the investment strategies, upon information and belief, he knew of and participated in tortious conduct by helping to set and then approve of the strategy to not fund, and delay in funding, as much maintenance and repairs as possible on the properties that make up the StoneyBrook Towers Investment.

76.     At FTW Investments, LLC, Defendant Webb oversees the company's operations and contributes to the investment strategies by building systems to key metrics and uphold company standards.

77.     Because Defendant Webb oversees the operations and contributes to the investment strategies, upon information and belief, he knew of and participated in tortious conduct by helping to set and then approve of the strategy to not fund, and delay in funding, as much maintenance and repairs as possible on the properties that make up the StoneyBrook Towers Investment.

78.     In addition, on promotional videos Defendant Webb boasts that investment in real estate involves "managing toilets, tenants, and trash, and frankly we're doing all that."

79.     At FTW Investments, LLC, Defendant Tuck oversees the due diligence of acquisitions, vets potential deal flow, manages investment-related initiatives, and is active in the company's investment research.

80.     Because Defendant Tuck oversees due diligence of acquisitions (including the two properties at issue in this case) and vets potential deal flow, upon information and belief, he knew

of and participated in tortious conduct by helping to set and then approve of the strategy to not fund, and delay in funding, as much maintenance and repair as possible on the properties that make up the StoneyBrook Towers Investment.

**Defendants threaten their tenants to keep them quiet about the unsafe and uninhabitable living conditions.**

81. While the properties involved in their StoneyBrook Towers Investment were nothing more than "underlying assets" to Defendants, they were and still are home to hundreds of Independence residents.

82. Defendants leveraged the limited availability of affordable housing in order to maximize the return on their investment at the expense of their tenants' rights.

83. For instance, if tenants complain they are threatened that they will receive a non-renewal notice. In fact, Defendants have gone so far as to not only refuse renewal for their tenants who complain, but to disparage them within the rental community wherein residents would need to seek alternate housing. This means that if they can find another apartment they can afford, their application is denied.

84. For instance, when Plaintiff Carver complained about the filthy and uninhabitable conditions Defendants forced upon him and his family, they sent him a non-renewal notice and told the owners of the apartment building that he was applying to that he had a negative rental history. This was not true; he always paid his rent on time.

85. Given the limited amount of affordable housing, this was enough to have Plaintiff Carver's application denied. He lost his application fee and struggled to find a place to live upon being kicked out by Defendants.

86. Defendants want their tenants to believe that homelessness is their only alternative so that they will, out of fear and lack of choice, put up with unsafe, dangerous, and illegal living conditions, pay their rent, and suffer in silence.

87. In other words, the message is "keep quiet or you'll be homeless." Meanwhile, the buildings are not safe or habitable because of Defendants.

**Because of Defendants, Independence Towers is neither safe nor habitable.**

88. Defendants knew or should have known that the concerns identified in the report they withheld from their investors were real. The roof failed in 2022, causing water to enter the building and the roof to be replaced. Water leaked into the parking garage and a February 2023 structural assessment of the parking garage revealed structural concerns that warranted addressing.

89. Soon after Defendants purchased the Stoneybrook Towers Investment properties, the buildings and living conditions began to deteriorate quickly. Whereas the buildings had always been habitable before, including in terms of maintenance and safety, Defendants neglected such matters—the less money they put in, the higher they saw their return.

90. Defendants were told the roof needed to be replaced, ignored this, and then, unsurprisingly, the roof failed in 2022 causing water damage to the building, which leads to mold and toxin contamination.

91. Around that same time, Defendants attempted to save money on needed plumbing repairs, but ended up making things much worse. They started in the vacant apartments on the tenth floor, which was the wrong thing to do and caused the sanitary lines to burst on the ground floor, damaging units and common areas, including causing an infestation of increased rodents, insects, and mold.

92. By way of example, here are a few pictures showing such infestation:





93.     In January 2023, an inspection was done pursuant to a Rental Ready program. Among other things, the inspection revealed that of the apartment units inspected, 15% of them were "unsafe to occupy." This was because of holes in the walls and the ceilings.

94.     The occupied apartments also experienced holes and water damage to the ceiling and walls.

95.     For example, here are a few such pictures of an occupied apartment:





96.     Defendants did not address these concerns, and instead, upon information and belief, threatened their tenants with non-renewal notices if they made any complaints.

97.     A July 21, 2023 Property Condition Assessment done on behalf of Fannie Mae discovered that because Defendants failed to do routine concrete repair and replacement, there existed dangerous and unsafe cracking and other tripping hazards that were deemed a "Life Safety" issue requiring immediate repair.

98.     This same assessment found five "Critical Repair" issues in the building, requiring over $500,000.00 to fix.

99.     Fannie Mae defines "Critical Repairs" as needed repairs that "significantly impact the safety, soundness, structural integrity or habitability of the project's building(s), or the financial viability or marketability of the project."

100.    Defendants' neglect and negligence has also caused outages of basic services. For instance, in or around February of 2024, there was no hot water for several weeks.

101.    The laundry rooms were also not properly maintained. They flooded, leading to water damage in nearby apartments and mold.

102.    For example, here are a few pictures of one such laundry room:





103. And another:

Electronically Filed - JACKSON - INDEPENDENCE - August 09, 2024 - 04:51 PM





104.    Defendants did not address these concerns, and instead, upon information and belief, threatened their tenants with non-renewal notices if they made any complaints.

105.    In fact, Defendants' neglect and negligence is so bad that Fannie Mae recently filed a petition in the Circuit Court of Jackson County on the grounds that Defendant 728 N Jennings "has failed to make repairs necessary to keep the Apartments in a safe and habitable condition." Fannie Mae seeks "the appointment of a general receiver to take control of substantially all of

[Defendant 728 N Jennings'] property and business operations." Fannie Mae states that "the appointment of a receiver is necessary in order to protect and preserve [Defendant 728 N. Jennings'] property ... and to make the repairs necessary to return [Defendant 728 N Jennings] property to a safe condition.

106.    After initially opposing a receivership, Defendant 728 N Jennings agreed to one, and the Court entered its Order for Appointment of Receiver on May 16, 2024.

107.    By this time, Defendants' neglect and negligence had let the property deteriorate even further.

108.    According to the Receiver, in May of 2024 the property still had the following problems:

    a.    The building inside temperature was very hot as the boiler was still in heat mode and had not been turned off and switched over to the chiller for the season.

    b.    The property was very dirty, and the landscaping was overgrown.

    c.    Security was lacking to the point that 24/7 security for the safety and protection of the building, residents, and staff was warranted.

    d.    There was no office furniture or computers onsite, nor were there working phone lines.

    e.    Keys were disorganized and not properly secured.

    f.    There were no maintenance supplies or tools onsite.

    g.    There was an abundance of trash built up in a large room which was a former clubhouse or office area, requiring removal for sanitary purposes.

    h.    The property had evidence of chronic plumbing issues, particularly obvious

in the parking garage.

i.      Several stairways were missing light bulbs. Exterior light poles were not

working.

j.      The laundry rooms were extremely dirty.

k.      The chiller was in very bad condition requiring over $500,000.00 in repairs

just to get it to fire up and perform further diagnoses and potentially

encounter plumbing leaks within the walls once under pressure.

l.      Residents lacked air conditioners.

m.      The parking garage was structurally unsafe.

**Likewise, StoneyBrook East Apartments was neither safe nor habitable when Defendants owned and controlled it.**

109.    Again, due to Defendants' neglect and negligence, stemming from their view that the less money they could put into these properties, the more money their investments would make, the building was not habitable, including in terms of maintenance and safety.

110.    For weeks at a time, including December 2022 and April 2023, the lights in the common areas, including the interior hallways and stairs, did not work. This created a dangerous situation, not only in terms of security, but also the challenge of navigating stairs and hallways that are pitch-black. Plaintiff Carver fell down the dark stairs, and there was at least one resident who lived on the top floor and used crutches.

111.    Plaintiff Carver was told the air conditioning worked when he moved in, only to discover the next Spring that it did not work.

112.    Often there would be no hot water, including on or about April 2023, August 2023, December 2023, and February 2024.

113.    At times there would not even be any running water at all.

114.     Defendants did not provide Plaintiff Carver with a usable bathtub or shower for two weeks after he moved in.

115.     Defendants did not provide him with working smoke detectors when he moved in.

116.     When Plaintiff Carver first moved in, he did not have a working refrigerator for weeks.

117.     Being derelict in repairing appliances was a common theme, not just limited to refrigerators but also garbage disposals and dishwashers. This led to rotting and mold.

118.     Upon information and belief, repairs are not timely made at least in part because Defendants have a habit and practice of either not paying their vendors on time or not at all. Again, they believe the less money they put into their "investments," the better.

119.     Defendants also would often not pay the trash bill and other utility bills, despite charging and collecting money for these bills from their tenants.

120.     Due to Defendants' neglect and negligence, racoons invaded the apartments, living in the walls, ceiling, ductwork, and inside tenants' apartments.

121.     Wild racoons are dangerous, violent, and carry diseases such as rabies.

122.     When these issues were reported, they were not timely addressed by Defendants if they are even addressed at all.

## CLASS ACTION ALLEGATIONS

### The Independence Towers Class

123.     Plaintiff Paylor brings this class action pursuant to Missouri Rule of Civil Procedure 52.08, on behalf of herself and the following Class of similarly situated persons:

a. All Missouri residents who were subject to a lease with one or more Defendants and rented at the Independence Towers at any time between March 2021 and the present.

124. This class is limited to Missouri citizens and is referred to as the "Independence Towers class.".

125. The proposed Independence Towers Class meets all requirements for class certification. The Class satisfies the numerosity standards. The Independence Towers Class is believed to number in the hundreds of persons. As a result, joinder of all Independence Towers Class Members in a single action is impracticable. Independence Towers Class Members may be informed of the pendency of this Class Action by mailing, published, and/or broadcast notice.

126. There are questions of fact and law common to the Independence Towers Class which predominate over any questions affecting only individual members. The questions of law and fact common to the Class arising from Defendants' conduct include, without limitation, the following:

a. Whether Defendants had a meeting of the minds on an object to be accomplished, including to make a profit off the Independence Towers as an investment;

b. Whether a Defendant engaged in one or more illegal or unlawful acts in furtherance of accomplishing an agreed-upon object, including acts that violated Missouri's Merchandising Practicing Acts and/or the implied warranty of habitability;

c. Whether the living conditions at Independence Towers are unsafe for the tenants;

d.      Whether the living conditions at Independence Towers are unsafe for the tenants because of mold in their units;

e.      Whether the living conditions at Independence Towers are unsafe for the tenants because of water damage to the units and building;

f.      Whether the living conditions at Independence Towers are unsafe for the tenants because of mice infestation in the units and building;

g.      Whether the living conditions at Independence Towers are unsafe for the tenants due to doors and windows not being secured;

h.      Whether the living conditions at Independence Towers are unsafe for the tenants due to cockroach, bedbug, and other insect infestations;

i.      Whether the living conditions at Independence Towers are unsafe for the tenants due to lack of heating and/or air conditioning;

j.      Whether the living conditions at Independence Towers are unsafe for the tenants because of untimely, ineffective and/or inadequate repairs;

k.      Whether the living conditions at Independence Towers are unsafe for the tenants because of untimely, ineffective, or inadequate maintenance;

l.      Whether the living conditions at Independence Towers are unsafe for the tenants because of dangers present in the common areas;

m.      Whether the living conditions at Independence Towers violates Missouri's implied warranty of habitability;

n.      Whether Defendants' conduct violated the Missouri Merchandising Practices Act; and

o. Whether Defendants' violations of the Missouri Merchandising Practices Act would cause a reasonable person to enter into the transaction.

127. The questions set forth above predominate over any questions affecting only individual persons, and a class action is superior with respect to considerations of consistency, economy, efficiency, fairness and equity, to other available methods for the fair and efficient adjudication of this controversy.

128. A class action is the appropriate method for the fair and efficient adjudication of this controversy. The damages suffered by individual members of the class may be relatively small, and the expense and burden of individual litigation make it impracticable for individual Independence Towers Class Members to pursue separate litigation. Such a situation would permit the Defendants to retain the benefits of their wrongdoing despite violating the law.

129. The claim of Plaintiff Paylor is typical of the claims of Members of the Independence Towers Class. Her claim arises from the same from the same course of conduct as all Independence Towers Class Members' claims, the underlying facts of each claim are identical or not significantly different, and Defendants' conduct and the facts give rise to the same legal theories.

130. Plaintiff Paylor is an adequate representative of the Class. She is a Class Member herself and her interests do not conflict with the interests of the other Members of the Class she seeks to represent. The interests of the members of the Class will be fairly and adequately protected by Plaintiff Paylor and her undersigned counsel, who have extensive experience prosecuting complex class action litigation.

131. Plaintiff Paylor seeks a refund of some or all monies paid under her lease based on Defendants' wrongful and improper conduct.

132.     Notice can be provided to Independence Tower Class Members by using techniques and forms of notice similar to those customarily used in other class actions.

**The StoneyBrook East Class**

133.     Plaintiff Carver brings this class action pursuant to Missouri Rule of Civil Procedure 52.08, on behalf of himself and the following Class of similarly situated persons:

a.     All Missouri residents who were subject to a lease with one or more Defendants and rented at the StoneyBrook East Towers at any time between January 2021 and the present.

134.     This class is limited to Missouri citizens and is referred to as the "StoneyBrook East Class.".

135.     The proposed StoneyBrook East Class meets all requirements for class certification. The StoneyBrook East Class satisfies the numerosity standards. The StoneyBrook East Class is believed to number in the hundreds of persons. As a result, joinder of all StoneyBrook East Class Members in a single action is impracticable. StoneyBrook East Class Members may be informed of the pendency of this Class Action by mailing, published, and/or broadcast notice.

136.     There are questions of fact and law common to the StoneyBrook East Class which predominate over any questions affecting only individual members. The questions of law and fact common to the Class arising from Defendants' conduct include, without limitation, the following:

a.     Whether Defendants had a meeting of the minds on an object to be accomplished, including to make a profit off the StoneyBrook East Apartments as an investment;

b.     Whether a Defendant engaged in one or more illegal or unlawful acts in

furtherance of accomplishing their agreed-upon object, including acts that
violated Missouri's Merchandising Practicing Acts and/or the implied
warranty of habitability;

c.    Whether the living conditions at StoneyBrook East Apartments are unsafe
for the tenants;

d.    Whether the living conditions at StoneyBrook East Apartments are unsafe
for the tenants because of mold in their units;

e.    Whether the living conditions at StoneyBrook East Apartments are unsafe
for the tenants because of water damage to the units and building;

f.    Whether the living conditions at StoneyBrook East Apartments are unsafe
for the tenants because of racoon infestation in the units and building;

g.    Whether the living conditions at StoneyBrook East Apartments are unsafe
for the tenants due to doors and windows not being secured;

h.    Whether the living conditions at StoneyBrook East Apartments are unsafe
for the tenants due to cockroach, bedbug, and other insect infestations;

i.    Whether the living conditions at StoneyBrook East Apartments are unsafe
for the tenants due to lack of heating and/or air conditioning;

j.    Whether the living conditions at StoneyBrook East Apartments are unsafe
for the tenants because of untimely, ineffective and/or inadequate repairs;

k.    Whether the living conditions at StoneyBrook East Apartments are unsafe
for the tenants because of untimely, ineffective, or inadequate maintenance;

l.    Whether the living conditions at StoneyBrook East Apartments are unsafe
for the tenants because of dangers present in the common areas;

31

m.   Whether the living conditions at StoneyBrook East Apartments violates Missouri's implied warranty of habitability;

n.   Whether Defendants' conduct violated the Missouri Merchandising Practices Act; and

o.   Whether Defendants' violations of the Missouri Merchandising Practices Act would cause a reasonable person to enter into the transaction.

137.   The questions set forth above predominate over any questions affecting only individual persons, and a class action is superior with respect to considerations of consistency, economy, efficiency, fairness and equity, to other available methods for the fair and efficient adjudication of this controversy.

138.   A class action is the appropriate method for the fair and efficient adjudication of this controversy. The damages suffered by individual members of the class may be relatively small, and the expense and burden of individual litigation make it impracticable for individual StoneyBrook East Class Members to pursue separate litigation. Such a situation would permit the Defendants to retain the benefits of their wrongdoing despite violating the law.

139.   The claim of Plaintiff Carver is typical of the claims of Members of the StoneyBrook East Class. His claim arises from the same from the same course of conduct as all StoneyBrook East Class Members' claims, the underlying facts of each claim are identical or not significantly different, and Defendants' conduct and the facts give rise to the same legal theories.

140.   Plaintiff Carver is an adequate representative of the Class. He is a Class Member himself and his interests do not conflict with the interests of the other Members of the Class he seeks to represent. The interests of the members of the Class will be fairly and adequately protected

by Plaintiff Carver and his undersigned counsel, who have extensive experience prosecuting complex class action litigation.

141.    Plaintiff Carver seeks a refund of some or all monies paid under his lease based on Defendants' wrongful and improper conduct.

142.    Notice can be provided to StoneyBrook East Class Members by using techniques and forms of notice similar to those customarily used in other class actions.

## CLAIM FOR RELIEF

### COUNT I – BREACH OF IMPLIED WARRANTY OF HABITABILITY

**Plaintiff Paylor, on behalf of herself and all others similarly situated v. All Defendants**

143.    Plaintiff Paylor incorporates by reference the foregoing statements and allegations as though fully set forth herein.

144.    Plaintiff Paylor, and members of the Independence Towers Class entered into a lease agreement to live at the Independence Towers.

145.    These leases, like all residential leases in Missouri, included an implied warranty of habitability which requires the landlord to deliver and/or maintain the premises free from dangerous or unsanitary conditions that can materially affect the life, health and safety of the tenant.

146.    This was a material term of the leases and/or a crucial element of the consideration for the rental agreement.

147.    After Defendants came to own and control the building, dangerous and/or unsanitary conditions in the apartment units and common areas arose and/or were reported to Defendants, and these conditions materially affected the life, health and safety of the tenants.

148.    These conditions, upon information and belief, include:

a.      Mold;

b.      water damage;

c.      mice infestation;

d.      unsecured doors and windows;

e.      cockroach, bedbug, and other insect infestations;

f.       lack of heating;

g.       lack of air conditioning;

h.        untimely, ineffective and/or inadequate repairs;

i.         untimely, ineffective, or inadequate maintenance; and

j.        dangers present in the common areas.

149.    Despite having notice of such dangerous and unsanitary conditions, Defendants failed to take adequate measures to address them or otherwise restore the premises to habitability.

150.    Defendants thereby breached the warranty of habitability implied in the leases with Plaintiff Paylor and Independence Towers Class Members.

151.    The uninhabitable conditions of Plaintiff Paylor and the Independence Towers Class Members' units renders the value of Plaintiffs' units at zero dollars ($0.00) per month, and thus their obligation to pay full and total rent under the terms of the lease to Defendants was suspended.

As such, Plaintiff Paylor, on behalf of herself and the Independence Tower Class Members, seeks compensation for the rent paid during the period their living premises were uninhabitable.

152.    Defendants' conduct which caused this damage was willful, wanton, and/or in reckless disregard for the rights of Plaintiff and the Independence Towers Class.

WHEREFORE, Plaintiff prays for judgment, on behalf of herself and all Independence Towers Class Members and against Defendants for actual damages, for the costs of this action, attorney's fees, and for such further relief as the Court deems fair and reasonable.

## COUNT II – VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT

**Plaintiff Paylor on behalf of herself and all others similarly situated v. All Defendants**

153.    Plaintiff re-alleges and incorporates herein all other allegations in this petition.

154.    The acts and practices engaged in by Defendants, and described herein, constitute unlawful, unfair and/or fraudulent business practices in violation of the Missouri Merchandising Practices Act, Mo. Ann. Stat. §§ 407.010 *et seq*.

155.    Defendant engaged in unlawful practices including deception, false promises, misrepresentation, and/or the concealment, suppression, or omission of material facts in connection with the lease of apartment units within the Independence Towers, in violation of Mo. Rev. Stat. § 407.020.

156.    Plaintiff Paylor and the Independence Towers Class Members leased the property for personal, household, and family use, and are therefore covered by the consumer protections found within the MMPA in connection with their leases and apartments.

157.    A reasonable consumer would expect an apartment to be delivered to them in a safe and sanitary condition, and would expect that, upon reasonable notice of unsafe or unsanitary conditions, those conditions will be remedied.

158.    Defendants misrepresented their ability and/or willingness to do so by offering leases with an implied warranty of habitability.

159.    Defendants also omitted the material fact that they were unwilling or unable to

deliver the apartments in safe and sanitary conditions, and/or unwilling or unable to remedy unsafe or unsanitary conditions upon reasonable notice.

160.    Plaintiff Paylor and the Independence Towers Class Members acted as reasonable consumers would in light of all circumstances.

161.    Defendants' actions and omissions would cause a reasonable person to enter in the sale and transaction that resulted in damages to Plaintiff and the Independence Towers Class.

162.    As a result of Defendants' actions and omissions, Plaintiff and the Independence Towers Class suffered economic damages that can be calculated with a reasonable degree of certainty, including a refund of monies paid.

163.    Defendants' conduct which caused this damage was willful, wanton, and/or in reckless disregard for the rights of Plaintiff and the Independence Towers Class.

WHEREFORE, Plaintiff, on behalf of herself and all others similarly situated, prays for judgment against Defendants for actual damages, for the costs of this action, attorney's fees, and for such further relief as the Court deems fair and reasonable.

## COUNT III – NEGLIGENCE

**Plaintiff Paylor, on behalf of herself and all others similarly situated v. All Defendants.**

164.    Plaintiff Paylor incorporates by reference the forgoing statements and allegations as though fully set forth herein.

165.    Defendants owed Plaintiff Paylor, and the members of the Independence Towers Class, a duty to exercise reasonable care in the acquisition (including due diligence), ownership, and management of Independence Towers.

166.    Defendants breached this duty by committing one or more of the following acts:

a.    Negligently and carelessly failing to raise sufficient funds for the

StoneyBrook Towers Investment;

b.    Negligently and carelessly failing to appreciate the significance of the items discovered during the pre-purchase inspections of the properties involved in the StoneyBrook Towers Investment;

c.    Negligently and carelessly performing inadequate pre-purchase due diligence on the StoneyBrook Towers Investment;

d.    Negligently and carelessly performing plumbing and other maintenance and repair work inside the building that caused water damage;

e.    Negligently and carelessly performing plumbing and other maintenance and repair work inside the building that allowed vermin, rodents, and insects to enter and/or multiply inside the building; and

f.    Negligently and carelessly performing other acts and omission as of yet undiscovered.

167.    Defendants' duty to use reasonable care includes providing residents of Independence Towers with safe and habitable apartments.

168.    Defendants breached this duty by providing unsafe and unhabitable apartments, due to one or more of the following conditions:

a.    Mold;

b.    water damage;

c.    mice infestation;

d.    unsecured doors and windows;

e.    cockroach, bedbug, and other insect infestations;

f.    lack of heating;

g.     lack of air conditioning;

h.     untimely, ineffective and/or inadequate repairs;

i.     untimely, ineffective, or inadequate maintenance; and

j.     dangers present in the common areas.

169.    Defendants' negligence proximately caused injuries to Plaintiff and members of the Independence Towers Class.

170.    As a direct and proximate result of the individual and collective acts of negligence conduct by Defendants, Plaintiff and each member of the Independence Towers Class was harmed and have suffered the loss of money and property, including: humiliation and anguish because of living in substandard and unsafe conditions, stress, anxiety, depression, emotional distress, loss of sleep, worsening of health, paying rent while the premises were and are substandard, payment of a security deposit, loss of full use of their moving costs, eviction, credit harm, and unnecessary out-of-pocket costs.

WHEREFORE, Plaintiff, on behalf of herself and all others similarly situated, prays for judgment against Defendants for actual damages, for the costs of this action, attorney's fees, and for such further relief as the Court deems fair and reasonable.

### COUNT IV – BREACH OF IMPLIED WARRANTY OF HABITABILITY

### Plaintiff Carver, on behalf of himself and all others similarly situated v. All Defendants

171.    Plaintiff Carver incorporates by reference the foregoing statements and allegations as though fully set forth herein.

172.    Plaintiff Carver, and members of the StoneyBrook East Class entered into a lease agreement to live at the StoneyBrook East Apartments.

173.    These leases, like all residential leases in Missouri, included an implied warranty

of habitability which requires the landlord to deliver and/or maintain the premises free from dangerous or unsanitary conditions that can materially affect the life, health and safety of the tenant.

174. This was a material term of the leases and/or a crucial element of the consideration for the rental agreement.

175. After Defendants came to own and control the building, dangerous and/or unsanitary conditions in the apartment units and common areas arose and/or were reported to Defendants, and these conditions materially affected the life, health and safety of the tenants.

176. These conditions, upon information and belief, include:

a.    Mold;

b.    water damage;

c.    racoon infestation;

d.    unsecured doors and windows;

e.    cockroach, bedbug, and other insect infestations;

f.    lack of heating;

g.    lack of air conditioning;

h.    untimely, ineffective and/or inadequate repairs;

i.    untimely, ineffective, or inadequate maintenance; and

j.    dangers present in the common areas.

177. Despite having notice of such dangerous and unsanitary conditions, Defendants failed to take adequate measures to address them or otherwise restore the premises to habitability.

178. Defendants thereby breached the warranty of habitability implied in the leases with Plaintiff Carver and StoneyBrook East Class Members.

179.     The uninhabitable conditions of Plaintiff Carver and the StoneyBrook East Class Members' units renders the value of Plaintiffs' units at zero dollars ($0.00) per month, and thus their obligation to pay full and total rent under the terms of the lease to Defendants was suspended.

180.     As such, Plaintiff Carver, on behalf of himself and the StoneyBrook East Class Members, seeks compensation for the rent paid during the period their living premises were uninhabitable.

181.     Defendants' conduct which caused this damage was willful, wanton, and/or in reckless disregard for the rights of Plaintiff and the StoneyBrook East Class.

WHEREFORE, Plaintiff prays for judgment, on behalf of himself and all StoneyBrook East Class Members and against Defendants for actual damages, for the costs of this action, attorney's fees, and for such further relief as the Court deems fair and reasonable.

## COUNT V – VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT

**Plaintiff Carver, on behalf of himself and all others similarly situated v. All Defendants**

182.     Plaintiff re-alleges and incorporates herein all other allegations in this petition.

183.     The acts and practices engaged in by Defendant, and described herein, constitute unlawful, unfair and/or fraudulent business practices in violation of the Missouri Merchandising Practices Act, Mo. Ann. Stat. §§ 407.010 *et seq.*

184.     Defendant engaged in unlawful practices including deception, false promises, misrepresentation, and/or the concealment, suppression, or omission of material facts in connection with the lease of apartment units within the Independence Towers, in violation of Mo. Rev. Stat. § 407.020.

185.     Plaintiff Carver and the StoneyBrook East Class Members leased the property for

personal, household, and family use, and are therefore covered by the consumer protections found within the MMPA in connection with their leases and apartments.

186.    A reasonable consumer would expect an apartment to be delivered to them in a safe and sanitary condition, and would expect that, upon reasonable notice of unsafe or unsanitary conditions, those conditions will be remedied.

187.    Defendants misrepresented their ability and/or willingness to do so by offering leases with an implied warranty of habitability.

188.    Defendants also omitted the material fact that they were unwilling or unable to deliver the apartments in safe and sanitary conditions, and/or unwilling or unable to remedy unsafe or unsanitary conditions upon reasonable notice.

189.    Plaintiff Carver and the StoneyBrook East Class Members acted as reasonable consumers would in light of all circumstances.

190.    Defendants' actions and omissions would cause a reasonable person to enter in the sale and transaction that resulted in damages to Plaintiff and the StoneyBrook East Class.

191.    As a result of Defendants' actions and omissions, Plaintiff and the StoneyBrook East Class suffered economic damages that can be calculated with a reasonable degree of certainty, including a refund of monies paid.

192.    Defendants' conduct which caused this damage was willful, wanton, and/or in reckless disregard for the rights of Plaintiff and the StoneyBrook East Class.

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, prays for judgment against Defendants for actual damages, for the costs of this action, attorney's fees, and for such further relief as the Court deems fair and reasonable.

## COUNT VI – NEGLIGENCE

**Plaintiff Carver, on behalf of himself and all others similarly situated v. All Defendants.**

193.    Plaintiff Carver incorporates by reference the forgoing statements and allegations as though fully set forth herein.

194.    Defendants owed Plaintiff Carver, and the members of the StoneyBrook East Class, a duty to exercise reasonable care in the acquisition (including due diligence), ownership, and management of StoneyBrook East Apartments.

195.    Defendants breached this duty by committing one or more of the following acts:

    a.    Negligently and carelessly failing to raise sufficient funds for the StoneyBrook Towers Investment;

    b.    Negligently and carelessly failing to appreciate the significance of the items discovered during the pre-purchase inspections of the properties involved in the StoneyBrook Towers Investment;

    c.    Negligently and carelessly performing inadequate pre-purchase due diligence on the StoneyBrook Towers Investment;

    d.    Negligently and carelessly performing maintenance and repair work inside the building that allowed racoons, vermin, rodents, and insects to enter and/or multiply inside the building; and

    e.    Negligently and carelessly performing other acts and omission as of yet undiscovered.

196.    Defendants' duty to use reasonable care includes providing residents of StoenyBrook East Apartments with safe and habitable apartments.

197.    Defendants breached this duty by providing unsafe and unhabitable apartments, due to one or more of the following conditions:

a.    Mold;

b.    water damage;

c.    racoon infestation;

d.    unsecured doors and windows;

e.    cockroach, bedbug, and other insect infestations;

f.    lack of heating;

g.    lack of air conditioning;

h.    untimely, ineffective and/or inadequate repairs;

i.    untimely, ineffective, or inadequate maintenance; and

j.    dangers present in the common areas.

198.    Defendants' negligence proximately caused injuries to Plaintiff and members of the StoneyBrook East Class.

199.    As a direct and proximate result of the individual and collective acts of negligence conduct by Defendants, Plaintiff and each member of the StoneyBrook East Class was harmed and have suffered the loss of money and property, including: humiliation and anguish because of living in substandard and unsafe conditions, stress, anxiety, depression, emotional distress, loss of sleep, worsening of health, paying rent while the premises were and are substandard, payment of a security deposit, loss of full use of their moving costs, eviction, credit harm, and unnecessary out-of-pocket costs.

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, prays for judgment against Defendants for actual damages, for the costs of this action, attorney's fees, and for such further relief as the Court deems fair and reasonable.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, requests relief and judgment against Defendants as follows:

a. That the Court enter an order certifying the Classes, appointing Plaintiffs as representatives, appointing Plaintiffs' counsel as class counsel, and directing that reasonable notice of this action be given to the Classes;

b. For a judgment against Defendants for the causes of action alleged against it;

c. For damages in an amount to be proven at trial;

d. For attorney's fees;

e. For Plaintiffs' costs incurred; and

f. For such other relief in law or equity as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

HUMPHREY, FARRINGTON & McCLAIN, P.C.

*/s/ Jonathan M. Soper*

| | |
|---|---|
| Jonathan M. Soper | #61204 |
| jms@hfmlegal.com | |
| Kenneth B. McClain | #32430 |
| kbm@hfmlegal.com | |
| Chelsea McClain Pierce | #61471 |
| cmp@hfmlegal.com | |
| Andrew K. Smith | #60485 |
| aks@hfmlegal.com | |

221 W. Lexington, Suite 400
Independence, Missouri 64050
T:    (816) 836-5050
Fax:  (816) 836-8966
**ATTORNEYS FOR PLAINTIFFS**

45